# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-KA-00061-COA

**OTHA GALLION**                                              **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                      **APPELLEE**

DATE OF JUDGMENT: 05/17/2024
TRIAL JUDGE: HON. JANNIE M. LEWIS-BLACKMON
COURT FROM WHICH APPEALED: HOLMES COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER
BY: STACY L. FERRARO
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: INDIA MARIAH SPRINKLE
DISTRICT ATTORNEY: AKILLIE MALONE OLIVER
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 07/28/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Following a jury trial, Otha Gallion was convicted of manslaughter and sentenced to serve twenty years in the custody of the Department of Corrections. On appeal, Gallion argues (1) that "[t]he State's misconduct denied [him] a fair trial"; (2) that the trial court erred by allowing a police officer to give hearsay testimony about statements of witnesses to the shooting; (3) that another officer improperly opined on Gallion's claim of self-defense; (4) that the trial court erred by admitting a "gruesome" photograph of the victim; (5) that there is insufficient evidence to support the conviction; and (6) that the jury's verdict is contrary to the overwhelming weight of the evidence. For the reasons discussed below, we

find no reversible error and affirm Gallion's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2. Chris Ambrose lived on the same street in Tchula as his good friend, Otha Gallion. Ambrose worked the night shift at the Nissan plant in Canton and they spent many days hanging out together at Gallion's house. Around 2:30 p.m. on January 15, 2023, Gallion shot and killed Ambrose in front of Gallion's house. Police officers found Ambrose's body on the side of the road across the street from Gallion's house. A gun was "tucked under" Ambrose's arm.[1] Ambrose had died from a gunshot wound to the head. A large crowd had gathered in the area, but initially no one wanted to talk to the police about the shooting. Gallion was not present and did not come forward to talk to the police.

¶3. Tchula Police Chief Dustin Wadford found three shell casings in Gallion's yard. The shell casings were on the ground next to Gallion's SUV just inches apart. Ambrose's body was across the street from Gallion's yard "60 to 61 feet" from where the shell casings were recovered.[2] There was no blood in Gallion's yard or "any trail of blood" between Gallion's yard and Ambrose's body across the street.

¶4. About an hour and a half after the police arrived, they received tips that Gallion was the shooter. Eventually, Tchula police officer Minnie Steverson located Gallion at his sister Corinthian's house, which was across the street from Gallion's house. Gallion's cousin acknowledged that Gallion was in the house, but he "tr[ied] to close the door" on Steverson.

---

[1] Ambrose had what appeared to be "a bag of ecstasy" and "two bags of marijuana" in his front right pocket. The substances were not tested.

[2] Wadford testified that he used a tape measure to measure the distance.

2

Steverson insisted that she needed to talk to Gallion, and several minutes later Gallion emerged from the house. Gallion claimed that he shot Ambrose in self-defense. He stated that he and Ambrose "got in an argument and . . . were fighting," and "Ambrose pulled a gun on him." Gallion told Wadford that *after* he shot Ambrose, Ambrose "walked across the street and collapsed." Gallion said that Deundra Wilson was the only witness to the shooting and that Wilson "would back up [Gallion's] story." Wadford later recovered an AR-15 pistol from Gallion's house, which Gallion acknowledged was the gun he used to shoot Ambrose. The shell casings that Wadford recovered were a type used in an AR-15.

¶5.	Wilson testified that prior to the shooting, he was driving down Front Street and saw Gallion standing near the road in front of his house. Wilson stopped to talk, and Gallion began telling Wilson that he was going to kill a rival named "Boone." Wilson testified that Gallion talked about his beef with Boone "every day." Wilson thought Gallion seemed "serious" about killing Boone, and Wilson noticed that Gallion had "weapons" in his SUV. Wilson "left and went down the road" and then returned about five minutes later.

¶6.	When Wilson returned, Gallion and Ambrose were in Gallion's yard discussing a small debt. At first, they were "laughing . . . and joking" about it, but "they ended up getting serious," and it "turned into a mean little argument." Ambrose "pulled a gun out," "[b]ut he didn't point the gun" at Gallion. Wilson persuaded Ambrose to put away the gun, and Ambrose started "walking off, fixing to go home." But then Wilson heard Corinthian shout, "[N]o, Otha, no." Wilson turned, and Gallion was standing on the side running board of his SUV shooting at Ambrose. Wilson "looked over at Ambrose," and "Ambrose was already

3

on the ground, laid out." Wilson asked Gallion why he shot Ambrose after Ambrose had "put [his] gun up" and "was leaving."

¶7. Dr. Bryan Platt, the pathologist who performed Ambrose's autopsy, testified that Ambrose died of a gunshot wound to the back of his head. The entrance wound was in the back of Ambrose's head to the left of the midline, and the exit wound was on the left side of the crown of his head. Platt testified that the wound inflicted "catastrophic" and "rapidly fatal" injuries. Platt would not have expected Ambrose to continue to walk even five feet after he was shot.[3]

¶8. Corinthian testified that prior to the shooting, she "heard commotion" outside, so she looked out her front door and saw Gallion, Ambrose, and Wilson arguing near the road. Ambrose was "waving" a gun and threatening to "blow [Gallion's] brains out." Corinthian stated that she tried "to diffuse the situation" by telling Ambrose to leave, but Ambrose refused to leave. Corinthian stated that Ambrose put his gun to Gallion's head, that Gallion walked away from Ambrose, and that Ambrose followed Gallion, still holding his gun. Corinthian stated that Gallion suddenly fired his gun twice and shot Ambrose. Corinthian testified that she did not "know where [Gallion] got [his] gun from."

¶9. A Holmes County grand jury indicted Gallion for first-degree murder. Following a jury trial, he was convicted of the lesser-included offense of manslaughter and sentenced to serve twenty years in the custody of the Department of Corrections. Gallion later filed a

---

[3] On cross-examination, Dr. Platt testified that Ambrose's post-mortem toxicology report revealed the presence of methamphetamine, the metabolite for amphetamine, and metabolites for marijuana. Dr. Platt testified that it was not possible to determine from the toxicology report how recently Ambrose had ingested any of the substances.

4

notice of appeal.[4] On appeal, Gallion argues (1) that "[t]he State's misconduct denied [him] a fair trial"; (2) that Steverson's testimony about Wilson's and Corinthian's out-of-court statements was hearsay; (3) that Wadford improperly opined on Gallion's claim of self-defense; (4) that the trial court erred by overruling Gallion's objection to a "gruesome" photograph of Ambrose's face; (5) that the State failed to present legally sufficient evidence; and (6) that the jury's verdict is contrary to the overwhelming weight of the evidence.

## ANALYSIS

### I.    Alleged Prosecutorial Misconduct

¶10.    In his first issue on appeal, Gallion contends that the State committed "misconduct" by making the following argument during its opening statement:

---

[4] Gallion's retained trial counsel did not file any post-trial motions. After Gallion was sentenced, trial counsel filed a motion for permission to appeal in forma pauperis and to appoint the Indigent Appeals Division (IAD) of the Office of the State Public Defender to represent Gallion on appeal. Gallion filed a supporting affidavit stating that he was indigent and lacked funds to retain appellate counsel. The trial court granted Gallion's motion, but IAD was not notified of the appointment, and Gallion's trial counsel failed to file a timely notice of appeal. Moreover, trial counsel did not file a motion to withdraw or obtain permission to withdraw. More than six months later, IAD filed a motion in the trial court for permission to file an out-of-time appeal. IAD stated that it had only recently learned of its appointment and maintained that Gallion's failure to file a timely appeal was "through no fault of its own." The trial court entered an order authorizing an out-of-time appeal. However, outside the context of a motion for post-conviction collateral relief filed as a new civil action, a trial court lacks authority to authorize an out-of-time appeal more than 180 days after the entry of judgment. *See* M.R.A.P. 4(g)-(h); *Dorsey v. State*, 986 So. 2d 1080, 1083-84 (¶11) (Miss. Ct. App. 2008). Nonetheless, because it appears that the failure to file a timely notice of appeal was not due to any fault on Gallion's part, we exercise our discretion to suspend the rules and allow Gallion's untimely appeal to proceed. *See* M.R.A.P. 2(c); *Dorsey*, 986 So. 2d at 1084 (¶12). We remind trial counsel in criminal cases that "[u]nless trial counsel properly obtains the trial court's leave to withdraw, counsel has an obligation to file a notice of appeal even if counsel has not agreed to represent the defendant on appeal." *Pulliam v. State*, 282 So. 3d 734, 736 n.2 (Miss. Ct. App. 2019).

5

> When the law enforcement arrived there was lots of people out on the scene, but you know who wasn't out on the scene? Mr. Gallion wasn't out on scene. . . . While the police have come out here, and this man is dead on the streets, that you allege you shot in self-defense. You are in a house[;] you didn't even come outside to tell the police what happened. They had to come and get you.

Although Gallion did not object to this argument at trial, he now contends that the prosecutor improperly commented on his right to remain silent under the Fifth Amendment to the United States Constitution. We disagree.

¶11. "It is improper and, ordinarily, reversible error to comment on the accused's **post-Miranda** silence." *Swinney v. State*, 241 So. 3d 599, 608 (¶29) (Miss. 2018) (emphasis added) (quoting *Quick v. State*, 569 So. 2d 1197, 1199 (Miss. 1990)). This is because a *Miranda* warning[5] implicitly assures the accused that his silence will not be used against him. *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." *Id.* at 617. In this context, "silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Id.*

¶12. However, there is no similar unfairness when the State comments on a defendant's *pre-arrest* silence. *See Jenkins v. Anderson*, 447 U.S. 231, 240 (1980). Prior to arrest, the accused has received no implicit assurance that his silence will not be used against him. *Id.* Therefore, use of a defendant's pre-arrest silence to impeach the defendant's testimony that he acted in self-defense does not violate the Fifth Amendment or Fourteenth Amendment to the United States Constitution. *Id.* at 235-41. In addition, "a prosecutor's reference to a non-

---

[5] *See Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966).

testifying defendant's pre-arrest silence does not violate the privilege against self-incrimination if the defendant's silence is not induced by, or a response to, the actions of a government agent." *United States v. Elashyi*, 554 F.3d 480, 506 (5th Cir. 2008). "The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence *before he has any contact with the police*," and the State may urge the jury to "draw[] . . . a reasonable inference from silence in a situation in which the ordinary citizen would normally speak out." *Jenkins*, 447 U.S. at 243 (Stevens, J., concurring in the judgment) (emphasis added).

¶13.    Here, the prosecutor's opening statement clearly commented on Gallion's *pre-arrest* decision to hide in his sister's house rather than remain at the scene and cooperate with law enforcement. The State's argument that Gallion's *pre-arrest actions* were inconsistent with his claim of self-defense did not violate Gallion's constitutional rights. Therefore, Gallion's claim based on the State's opening statement is without merit.

¶14.    Gallion also argues that the district attorney committed misconduct by objecting during Corinthian's testimony on the ground that Corinthian was "lying." Defense counsel had asked Corinthian what she did after Ambrose was shot, and Corinthian answered that she "called 911" and then stated, "And you know he's in a highly officiali -- officiated gang and you know, getting threats."[6] The district attorney (Ms. Malone-Oliver) then objected:

MS. MALONE-OLIVER:  I'm going to object.

THE COURT: What's the objection?

---

[6] What Corinthian meant by this is not clear from the transcript.

7

MS. MALONE-OLIVER: She's lying for one thing.

MR. POWELL [(defense counsel)]: Objection, Your Honor.

MS. MALONE-OLIVER: And the relevance of it.

MR. POWELL: Unless she was there --

MS. MALONE-OLIVER: -- that has not been provided --

THE COURT: Wait a minute. One at a time. One at a time. Are you finished with your response?

MR. POWELL: Well, I'm object[ing] to the response that she was lying because the district attorney wasn't present at the scene.

THE COURT: You said that? That she was lyin --

MS. MALONE-OLIVER: At the --

THE COURT: You said that she was lying?

MS. MALONE-OLIVER: They though --

THE COURT: Excuse me. You said she was lying?

MS. MALONE-OLIVER: I think she's not being truthful.

THE COURT: Objection sustained.

¶15. We agree with Gallion that the district attorney's "objection" that Corinthian was "lying" was improper. To begin with, "She's lying" is not a valid objection under the Mississippi Rules of Evidence. The jury, not a prosecutor or the court, is the sole judge of a witness's credibility. *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2017). Moreover, Gallion correctly argues that "a prosecutor is forbidden from interjecting his personal beliefs regarding the veracity of witnesses." *Wilson v. State*, 194 So. 3d 855, 866 (¶36) (Miss.

8

2016). Asserting in the presence of the jury that a witness is "lying" obviously violates this rule. Thus, the district attorney's objection was clearly improper.

¶16. Nonetheless, the transcript indicates that the trial judge was taken aback by the district attorney's comment and "sustained" defense counsel's objection to it. Gallion did not follow up by asking the judge to instruct the jury to disregard the prosecutor's remark, nor did Gallion move for a mistrial. Because the judge "sustained [Gallion's] objection," and Gallion "did not ask the trial court to tell the jury to disregard" the improper statement, "there is no error." *Dukes v. State*, 369 So. 3d 553, 562 (¶31) (Miss. 2023). Moreover, "[i]t is now well settled that when anything transpires during the trial that would tend to prejudice the rights of defendant, he cannot wait and take his chances with the jury on a favorable verdict and then obtain a reversal of the cause in this Court because of such error, but he must ask the trial court for a mistrial upon the happening of such occurrence when the same is of such nature as would entitle him to a mistrial." *Taconi v. State*, 912 So. 2d 154, 157 (¶18) (Miss. Ct. App. 2005) (quoting *Blackwell v. State*, 44 So. 2d 409, 410 (Miss. 1950)). In sum, the trial court here properly sustained Gallion's objection, and Gallion waived any further claim of error by failing to contemporaneously request a jury instruction or move for a mistrial.

## II. Hearsay

¶17. Gallion next argues that the trial court erred by allowing Steverson to testify about statements Wilson and Corinthian made when Steverson interviewed them following the shooting. Gallion made a specific hearsay objection to Steverson's testimony about Wilson's statements prior to the subject testimony. The district attorney responded that Steverson's

interview of Wilson was "part of her investigation," and the trial court ruled that Steverson could "testify to what her investigation revealed and if Deundra Wilson talked to her about what happened." The court further stated that Steverson could "testify to that," and Wilson could be "impeached based on what [Steverson] testifie[d] to."

¶18. Following the trial court's ruling, the State asked Steverson whether Wilson had provided a statement, and Steverson answered in the affirmative. The State then asked, "And what was his statement?" Steverson then related a brief summary of Wilson's account of the shooting. Steverson's summary of Wilson's out-of-court statement was consistent with Wilson's more detailed testimony at trial.

¶19. "Primarily, hearsay testimony obtained by an officer in conducting an investigation is inadmissible." *Roberson v. State*, 185 So. 2d 667, 668 (Miss. 1966). Indeed, the Mississippi Supreme Court has "repeatedly condemned the use of hearsay testimony by officers obtained by way of investigation." *Bridgeforth v. State*, 498 So. 2d 796, 800 (Miss. 1986); *see also Ratcliff v. State*, 308 So. 2d 225, 227 (Miss. 1975) ("Investigators cannot be permitted to relate to a jury hearsay which is incriminating in its effect as to a defendant on trial for a crime."). Put simply, an officer cannot offer hearsay testimony just because the officer obtained the information during the course of an investigation.

¶20. However, the Mississippi Supreme Court has also held that "[w]hen an officer's testimony is being used to explain why he did what he did in the course of his investigation, not to prove the truth of the matter asserted, then the testimony is not hearsay and is therefore admissible." *Dukes*, 369 So. 3d at 562-63 (¶35). Testimony offered to explain "why [the

10

officer] did what he did as he proceeded with his investigation" is not considered "hearsay" because it is "not being used to prove the truth of a matter that was being asserted." *Id.* at 563 (¶35); *accord Swinney v. State*, 241 So. 3d 599, 610 (¶39) (Miss. 2018); *Stevens v. State*, 312 So. 3d 1205, 1209-10 (¶10) (Miss. Ct. App. 2021).

¶21. Thus, in this case, it might have been permissible for Steverson to testify that Wilson identified Gallion as the shooter to explain why Steverson identified Gallion as the suspect and arrested him. But by the time Steverson testified about the substance and details of Wilson's out-of-court statement, both Wadford and Steverson had already testified that they identified Gallion as the shooter based on tips Steverson received at the crime scene. It was therefore unnecessary for Steverson to relate the substance and details of Wilson's out-of-court statement to explain any subsequent steps in her investigation. Indeed, Steverson did not link Wilson's out-of-court statement to any subsequent investigative action she took. Rather, she simply told the jury what Wilson had told her. That is hearsay, and Gallion's objection to it should have been sustained.

¶22. Although Gallion's hearsay objection should have been sustained, we conclude that the error was harmless and does not require reversal. *See Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014) ("We will not reverse a conviction based on a harmless error."). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Jackson v. State*, 245 So. 3d 433, 439 (¶32) (Miss. 2018). In this case, Wadford had already testified—*without objection*—about the substance of Wilson's out-of-court statement. Thus, Steverson's

11

testimony was essentially duplicative of other testimony that was given without objection. Moreover, Wilson testified at trial and was subject to full cross-examination. In these circumstances, we cannot say that Steverson's hearsay testimony prejudiced Gallion's defense or adversely affected his substantial rights.

¶23. As noted above, Gallion also argues that the trial court erred by allowing Steverson to testify about the substance of Corinthian's out-of-court statements. However, Gallion did not object to this testimony at trial. Indeed, defense counsel extensively cross-examined Steverson regarding Corinthian's out-of-court statements, including statements that Ambrose threatened to "blow [Gallion's] brains out" and pointed his gun at Gallion prior to the shooting. It would appear that defense counsel made a strategic decision not to object to testimony about Corinthian's out-of-court statements, which tended to support Gallion's claim of self-defense. Because Gallion did not object to this testimony at trial, the issue is waived on appeal. *Rubenstein v. State*, 941 So. 2d 735, 764 (¶113) (Miss. 2006) ("[T]he failure to object to hearsay operates as a waiver of the issue on appeal.").

### III. "Police Officer Opinion Testimony"

¶24. Gallion next argues that "[t]he trial court erred in allowing police officer opinion testimony contradicting Gallion's theory of defense." Specifically, Gallion argues that Wadford was allowed to offer impermissible lay or expert opinions regarding his claim of self-defense. Gallion's argument is based on the following portion of Wadford's testimony on direct examination:

> Q.     Now in talking with Mr. Gallion, he indicated that it was self-defense, is that correct?

A. Yes, ma'am.

Q. Did you believe him?

A. No, ma'am not with the entry --

[Defense counsel]: Objection as to relevance.

THE COURT: Sustained. Sustained.

[(Prosecutor)]: Okay.

Q. Based on your investigation, did you think that him continuing with the self-defense was factual?

A. No, ma'am. He stated to us that he shot the victim on his property[,] that Mr. Ambrose was on his property. [That he] shot [Ambrose on his property and then Ambrose] walked across the street to where he fell down and lay.

Q. And then from your investigation did any of that appear to have happened?

A. No, ma'am.

¶25. What is immediately apparent from the transcript is that the trial court *sustained* Gallion's only objection to the subject testimony. The prosecutor then rephrased her question, and Gallion did not object to the rephrased question. "Because [Gallion] 'did not object to the rephrased question,' 'the issue is waived for purposes of appeal.'" *Simmons v. State*, 411 So. 3d 185, 193 (¶20) (Miss. Ct. App. 2024) (quoting *Keys v. State*, 33 So. 3d 1143, 1149 (¶22) (Miss. Ct. App. 2009)), *cert. denied*, 408 So. 3d 1274 (Miss. 2025). Moreover, Gallion did not ask the trial court to instruct the jury to disregard Wadford's testimony or move for a mistrial after the trial court sustained his objection to the prosecutor's initial question. Therefore, he also waived any claim of error with respect to

13

that question. *Dukes*, 369 So. 3d at 562 (¶31); *Taconi*, 912 So. 2d at 157 (¶18). Accordingly, this issue is waived, and we do not address it on the merits.

### IV.    Photograph of the Victim

¶26.    Gallion next argues that the trial court abused its discretion by admitting Exhibit S-3, a "gruesome close-up photograph" of "Ambrose's face covered in blood." Gallion argues that the State offered Exhibit S-3 only "to inflame the jury," that it was unnecessary because autopsy photos were admitted into evidence, and that it "was more prejudicial than probative."

¶27.    In *Martin v. State*, 289 So. 3d 703, 707 (¶7) (Miss. 2019), the Mississippi Supreme Court provided the following summary of the law regarding the admissibility of photographs of a homicide victim and our standard of review on appeal:

> Admission of photographs by the trial court is reviewed for abuse of discretion. A decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion. The discretion of the trial judge is almost unlimited regardless of the gruesomeness, repetitiveness, and the extenuation of probative value. Some probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence. So long as a photograph has probative value and its introduction serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory. A photograph has a meaningful evidentiary purpose when it: (1) aids in describing the circumstances of the killing; (2) describes the location of the body or cause of death; or (3) supplements or clarifies witness testimony.

*Id.* (citations, quotation marks, and ellipsis omitted) (quoting *Chamberlin v. State*, 989 So. 2d 320, 340 (¶73) (Miss. 2008)).

¶28.    Here, Exhibit S-3 is indeed a photo of the victim's face covered in blood. However, it was offered to show Ambrose's catastrophic injuries and to rebut Gallion's claim that he

14

shot Ambrose at close range and that Ambrose then stumbled across the street *after* he was shot. The photo had probative value because—consistent with Dr. Platt's testimony—it supported a reasonable inference that Ambrose would not have been able to walk across the street after such a serious gunshot wound to his head. Moreover, while the photo is bloody and unpleasant, it is not unduly "grisly" or "inflammatory." *Id.* Indeed, it is no more gruesome than the autopsy photos admitted at trial without objection. In these circumstances, the trial court did not abuse its discretion by admitting Exhibit S-3.

## V. Sufficiency and Weight of the Evidence

¶29. Lastly, Gallion argues that "the evidence was insufficient to support the verdict, and the verdict was against the weight of the evidence."[7] Specifically, he argues that "[t]he State failed to prove that [he] did not act in necessary self-defense." Therefore, he argues that we should reverse his conviction and render a judgment of acquittal or, in the alternative, remand the case for a new trial.

¶30. We review challenges to the sufficiency of the evidence de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). "We view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime." *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010) (quotation marks and brackets omitted). "[A]ll credible evidence supporting a defendant's guilt should be accepted as true, and all favorable

---

[7] "A challenge to the weight of the evidence is separate and distinct from a challenge to the legal sufficiency of the evidence." *Thomas v. State*, 48 So. 3d 460, 469 (¶20) (Miss. 2010). However, given that Gallion presents his argument as a single issue on appeal, we address both issues together.

inferences drawn from the evidence must be reconciled in the prosecution's favor." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole*, 46 So. 3d at 293-94 (¶20). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all elements of the offense." *Williamson v. State*, 375 So. 3d 1158, 1167 (¶19) (Miss. Ct. App. 2023) (citing *Poole*, 46 So. 3d at 293-94 (¶20)).

¶31. For challenges to the weight of the evidence, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* In addition, we "review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Id.* at 292 (¶21).[8]

¶32. In this case, the evidence is legally sufficient to support the conviction. Although Gallion and his sister claimed that he acted in self-defense, the State presented substantial evidence to prove that the killing was not in necessary self-defense. As discussed above,

---

[8] As noted above, Gallion did not file a motion for a new trial. *See supra* note 4. Therefore, this issue is waived. *Williamson*, 375 So. 3d at 1169 (¶26). However, Gallion preserved his challenge to the sufficiency of the evidence by moving for a directed verdict at the close of the evidence. Since the issues are closely related, we address both despite Gallion's failure to file a motion for a new trial.

Wilson testified that Ambrose had put away his gun and was walking away when Gallion shot him in the back of the head. Wilson testified that Gallion was in his yard at the time, and Ambrose was across the street walking away. Shell casings were found in Gallion's yard 60 feet away from Ambrose's body. There was no blood in Gallion's yard or any blood trail between Ambrose's body and Gallion's yard. Moreover, Dr. Platt testified that Ambrose suffered "catastrophic" and "rapidly fatal" injuries from the gunshot wound to the back of his head and that he would not have expected Ambrose to be able to walk even five feet after he was shot. This evidence all tends to show that Ambrose had put away his gun and headed home and that Gallion had no reasonable ground to believe that he was in imminent danger of great personal injury. *See* Miss. Code Ann. § 97-3-15(1)(f) (Rev. 2020). Accordingly, there was sufficient evidence for a rational juror to find beyond a reasonable doubt that Gallion did not act in justifiable self-defense. There was also sufficient evidence for the jury to find beyond a reasonable doubt that Gallion was guilty of manslaughter.

¶33. In addition, we do not reassess Wilson's or Corinthian's credibility, resolve conflicts in the evidence, or reweigh the evidence. "Those decisions belong solely to the jury." *Little*, 233 So. 3d at 289 (¶1). Moreover, the physical evidence supported Wilson's testimony, whereas the physical evidence and Dr. Platt's testimony contradicted Gallion's claim that Ambrose stumbled or walked across the street after being shot. Accordingly, we cannot say that the jury's verdict is contrary to the overwhelming weight of the evidence.

## CONCLUSION

¶34. Gallion identifies no reversible error in the conduct of his trial, the State presented

17

legally sufficient evidence to support the conviction, and the jury's verdict is not contrary to the overwhelming weight of the evidence. Therefore, Gallion's conviction and sentence are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**